# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

_____
                                        )
**SECURITIES AND EXCHANGE**             )
**COMMISSION,**                         )
                                        )      **CASE NO.**
    **Plaintiff,**  )
                                        )
**v.**                                  )      **COMPLAINT AND**
                                        )      **DEMAND FOR JURY TRIAL**
**MICHAEL P. TOUPS, and**               )
**LONGWEI PETROLEUM INVESTMENT**        )
**HOLDING LIMITED**                     )      **INJUNCTIVE RELIEF**
                                        )      **SOUGHT**
    **Defendants.** )
_____)

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against Defendants Michael P. Toups and Longwei Petroleum Investment Holding Limited ("Longwei," and collectively with Toups "Defendants"), and alleges as follows:

## SUMMARY

1.      For years, Longwei held itself out as a petroleum storage and sales company whose main competitive advantage was its sizeable storage capacity. But Longwei routinely overstated its storage capacity, and even after the overstatement was brought to the attention of the company, including its CFO, Defendant Michael Toups, nothing was done to correct the misstatement. Instead, the company continued to falsely tout its storage capacity in public filings and press releases drafted by Toups, intentionally ignoring contrary evidence from its own records, auditors, and consultants.

2.      In addition to the fraudulent statements regarding its storage capacity, Longwei and Toups conducted a fraudulent scheme to induce the exercise of warrants to purchase Longwei's stock when it was desperate for cash. By creating a false sense of urgency that the

company was going to let the warrants expire, while an extension of the deadline was imminent and already in process, Longwei and Toups induced investors to exercise their warrants. Further, Longwei and Toups concocted a plan to have Toups purchase Longwei stock—secretly using funds provided by the company—to give the impression that a high-ranking insider was investing his own money in the company.

3.      By engaging in the conduct described in this Complaint, Defendants have committed, and unless restrained and enjoined will continue to commit, violations of the antifraud and books and records provisions of the federal securities laws.

## DEFENDANTS

4.      **Longwei Petroleum Investment Holding Limited** is a Colorado corporation headquartered in Shanxi province, China.  At all relevant times, Longwei's principal place of business was in Shanxi, China.  Longwei is a publicly-traded company whose common stock is registered with the Commission under Section 12(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78l(b)].  Longwei's common stock is a security as defined by Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

5.      **Michael P. Toups**, age 50, resides in Tampa, Florida.  At all relevant times, Toups served as Chief Financial Officer for Longwei.  Toups resigned his position as CFO, for "personal reasons," in June 2013.

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to authority conferred on it by Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [ 15 U.S.C. §§ 78u(d) and 78u(e)].

7.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

8.      Venue is proper in this district because at all relevant times Toups was a resident of Tampa, Florida.

9.      In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

## FACTUAL ALLEGATIONS

### Longwei's Business Is Built on Fraudulent Statements

10.     According to its public disclosures, Longwei stores and sells petroleum products at three locations in Shanxi province, China: the Taiyuan, Gujiao, and Huajie facilities. Longwei claims that each of these facilities has delivery and distribution elements, including rail spurs and tanker truck loading stations.

11.     From these facilities, Longwei purports to store, sell, and transport four types of petroleum products: diesel fuel, gasoline, fuel oil, and solvents.

12.     Longwei's Taiyuan facility was its first facility, dating back to at least 2008. Since its Form 10-K for the fiscal year ended June 30, 2008, Longwei has disclosed that the Taiyuan facility has a total storage capacity of 50,000 metric tons. The number of storage tanks claimed for Taiyuan has varied from 8 tanks to 14 tanks. Despite the changing number of tanks, the amount of storage capacity disclosed for the Taiyuan facility has never varied.

13.     Longwei completed the acquisition of the Gujiao facility in 2009 and has consistently said in reports filed with the Commission and other public statements that the

facility has 70,000 metric tons of storage capacity. Like the Taiyuan facility, while the storage capacity has remained consistent, the number of tanks has been listed as 7, 8, and 14.

14.     On September 26, 2012, Longwei completed the acquisition of the Huajie facility, which it claimed had 100,000 metric tons of storage capacity.

15.     In numerous releases and reports filed with the Commission, Longwei said that its three facilities have a combined storage capacity of 220,000 metric tons, which it claimed was the largest of any private enterprise in Shanxi, China. And since at least its Form 10-K for the fiscal year ended June 30, 2009, Longwei has touted this capacity as one of its primary competitive advantages, at times calling it a "critical" and "distinct advantage" of the company.

16.     Longwei reports its storage capacity by weight (metric tons) and not by volume (cubic meters). The density of a product determines the volume that is required to store a metric ton of that product. For example, because diesel fuel is denser than gasoline, one metric ton of diesel fuel requires less storage space than one metric ton of gasoline. Thus, storage tanks with the capacity to hold just 50,000 metric tons of diesel fuel would be too small to hold 50,000 metric tons of gasoline.

17.     Longwei failed to accurately and consistently state the capacity of its storage tanks, routinely overstating the actual capacity in its public filings, in part, because Longwei did not accurately account for the fact that the products it stored had different densities.

**Longwei Shareholder Questions the Company's Storage Capacity Disclosures**

18.     On December 28, 2012, a Longwei shareholder questioned Longwei's claimed capacity of its storage tanks, especially at the Taiyuan facility, in an email to Longwei's U.S.-based auditor. The auditor reviewed its records for files listing the dimensions of the tanks at each of the facilities and found a spreadsheet provided by Longwei that included the dimensions

for only the Taiyuan facility.  The auditor emailed the spreadsheet to Toups and advised him that he should also obtain documents that substantiated the tank sizes at the Gujiao and Huajie facilities.

19.     After receiving the email from the auditor, Toups visited a third-party website to review the storage capacity of the tanks at Longwei's three facilities.  The website data indicated a storage capacity significantly less than the capacity disclosed by Longwei.

20.     Also on December 28, Toups emailed two Longwei consultants, attaching the Taiyuan storage capacity spreadsheet and requesting that the consultants obtain the tank dimensions for the Gujiao and Huajie facilities and calculate the capacity of those tanks.

21.     Over the next three days, Toups emailed the Longwei consultants and the auditor numerous times, discussing the allegations and requesting additional information about the company's storage capacity, including how the inventory system calculated the capacity and asking them to "get the proper dimensions for the three facilities."

22.     In these emails, however, Toups was less focused on finding the truth about the company's disclosures, and more interested in responding as soon as possible to "bashers" and "attacks from message boards questioning the size of the tank[s]."

23.     The information obtained by Toups during this time showed that Longwei had been overstating not only its storage capacity, but also its inventory.

### Toups and Longwei Issue a False Press Release

24.     On January 1, 2013, Toups drafted a press release that reiterated Longwei's previous statements about its fuel storage capacity and assured investors that its capacity calculations met industry standards:

> Longwei's storage capacity is reported in metric tons based on the
> mass or weight of the product converted to volume storage based

> on the density of the product stored in its tanks, which consists of
> above and below ground storage. The volume storage capacity
> measurement is calculated in accordance with industry standards ...
> The Company has a storage capacity for its products of 220,000
> metric tons located at three storage facilities within Shanxi:
> Taiyuan, Gujiao and Huajie, which have an individual storage
> capacity of approximately 50,000 metric tons ('mt'), 70,000mt,
> and 100,000mt, respectively.

25.    At the time he drafted the press release, Toups knew, or was severely reckless in not knowing, that the statements regarding storage capacity in the press release were false. And even if he did not know that the statements were false, he knew, or was severely reckless in not knowing, that he lacked information, or any other reasonable basis, to confirm that the company's claims regarding its storage capacity were true.

26.    Before the market opened on January 2, 2013, Longwei issued the press release prepared by Toups, even though Toups and the company had not received any materials supporting the published statements.

27.    After the press release was issued, Longwei's stock price—which closed the previous day at $2.11 per share—opened at $2.30 per share. The price then jumped to a high of $2.81 before closing at $2.30. Trading on that day was unusually high: more than 1.4 million shares traded, compared to an average of approximately 440,000 shares traded daily during the preceding three months.

28.    On the same day that the press release was issued, Toups received documents from Longwei's consultants that had purportedly been obtained from the Fire Protection Bureau in Shanxi, China and allegedly listed the dimensions for the tanks at each of the facilities.

29.    According to these documents, Longwei's facilities had a combined capacity between 117,650 metric tons (for diesel) and 154,660 metric tons (for gasoline)—far less than

*SEC v. Michael P. Toups, et al.*
Complaint

the 220,000 metric tons that Toups stated in the press release issued earlier that day and that Longwei had been reporting publicly for years.

30.     Although this information confirmed that Longwei's capacity was substantially less than disclosed, Toups and Longwei made no efforts to correct the press release.

**Longwei and Toups Conduct an Illusory Review of Allegations of Fraud**

31.     On January 3, 2013, the day after the press release, a research firm published a report alleging that Longwei was a "massive fraud." The firm alleged, among other things, that Longwei vastly overstated its petroleum sales for November 2012, based on video surveillance conducted by the firm at the three facilities. The firm claimed to have conducted video surveillance of the Taiyuan and Gujiao Facilities from October 26, 2012, to December 13, 2012, and surveillance of the Huajie Facility from December 9 to 22, 2012. This surveillance detected only five tanker trucks fueling at Longwei's facilities over this span: one at Taiyuan, four at Gujiao, and none at Huajie. Although Longwei claimed that it sold over 44,000 metric tons in November 2012, the research firm concluded that its surveillance indicated no more than 100 metric tons had been sold.

32.     The report had an immediate and dire impact on Longwei's stock price, which fell approximately 73% (from $2.29 to $0.62), and has never recovered. Soon thereafter, NYSE MKT suspended trading in, and ultimately delisted, Longwei's stock.

33.     In response to the research firm's report, Toups and others, including representatives from Longwei's U.S.-based auditor, traveled to China to visit the Longwei facilities. While Toups and the auditors were in China, Longwei's China-based management prevented them from accessing certain portions of the facilities and speaking with some of the company's executives. In addition, Toups and the auditors were denied access to the company's

financial records.  Longwei's chairman told Toups that the accounting manager had the keys to the accounting records, but she was out of the office traveling and Toups would have to wait to obtain the records.  Toups never obtained these records.

34.     In addition to requesting access to the financial records, Toups and the Chair of Longwei's audit committee also requested that Longwei designate funds to hire experts to independently investigate the research firm's allegations.  Longwei never approved those funds.

35.     As a result of the limited access during the visit to the company's facilities, the refusal to provide access to accounting records, and the denial of funds to conduct an internal investigation, the Chair of Longwei's audit committee resigned on January 31, 2013.  Toups, however, stayed with the company.

36.     On February 26, 2013, and again on March 11, 2013, Longwei issued press releases drafted by Toups that reiterated the prior false statements about the storage capacity and failed to disclose that Longwei had discovered multiple documents that contradicted its disclosures on both storage capacity and inventory.  The press releases also said that Longwei's management was cooperating with its legal counsel and auditors to review the allegations.  These statements were false and failed to disclose that Longwei's management (i) never provided critical accounting records requested by Toups and the auditors; (ii) blocked Toups and the auditors from accessing certain facilities in China; and (iii) refused to provide funds to conduct an internal investigation of the research firm's allegations.

37.     When Toups drafted these press releases he knew, or was severely reckless in not knowing, that the statements in the press releases were false.

38.     Since these press releases, Longwei has virtually disappeared from the U.S. markets: the company's stock was delisted from the NYSE MKT and is now trading on the OTC

market; it has not filed any required quarterly or annual reports since November 2012; and its U.S.-based auditor resigned on May 30, 2013, citing a "limitation on the scope of its work imposed by the company."

39.     Toups resigned as CFO of Longwei on June 28, 2013, the same day he received a severance of $240,000, an amount equal to two years of his salary.

**Toups and Longwei Scheme to Fraudulently Raise Cash from Warrant Holders**

40.     Shortly before the controversy regarding Longwei's storage capacity and the fraud allegations raised by the third-party research firm, Toups and the company engaged in a fraudulent scheme to raise funds from warrant holders.

41.     In October 2009, Longwei sold 13,499,274 units, composed of one share of preferred stock and a warrant to purchase one share of Longwei common stock at an exercise price of $2.255 per share. The warrants had a three-year term.

42.     In October 2012, shortly before the scheduled expiration of the warrants, Haoxiang Li, an advisor and translator for Longwei's CEO, told Toups that Longwei urgently needed cash to purchase inventory for the newly acquired Huajie facility. In its contemporaneous SEC filings, however, Longwei claimed to have more than $14 million in cash.

43.     To generate the needed cash, Li asked Toups to pressure Longwei's warrant holders to exercise their warrants before they expired at the end of October 2012. In the following days, Li continued to press this point, explaining that the Company's CEO was "very disappointed" by Toups's failure to secure more warrant exercises, and even suggesting that Toups's compensation was dependent on the exercise of a substantial number of warrants.

44.     Because the stock price in early October 2012 was below the $2.255 exercise price of the warrants, Toups was aware that the warrant holders had little incentive to exercise

their warrants because the stock could be purchased on the open market at a price lower than the warrant exercise price.

45.     Toups and Longwei undertook multiple strategies to encourage the warrant holders to exercise their contracts: (1) creating a false sense of urgency for the exercise of the warrants; and (2) having Toups conduct a sham purchase of Longwei stock to artificially drive up the stock price.

**Toups and Longwei Create a False Sense of Urgency to Induce Warrant Exercises**

46.     Longwei's warrants were set to expire on October 29, 2012. And Toups believed that if the market expected that Longwei would not extend the warrant exercise deadline, then Longwei's stock price would increase.

47.     Throughout September and October 2012, including on an earnings call and in various email exchanges with investors and their representatives, Toups told warrant holders that the exercise deadline would not be extended and encouraged them to exercise their warrants ahead of the October 29 deadline. But during this same time, Toups knew that Longwei was considering extending the deadline.

48.     On October 23, 2012, Toups sent board resolutions to the company's directors that would authorize an extension of the deadline to exercise the warrants for up to six months. Longwei's board members signed the resolutions on October 24, and its CEO approved extending the deadline by one month—to November 29, 2012—early the *morning* of October 29, 2012. But Longwei did not disclose the extension to warrant holders and the investing public until after 4:00pm Eastern Time, when Longwei announced the information in a Form 8-K filed with the Commission.

49.     As the extension was announced, some warrant holders were affected by Hurricane Sandy. Without knowing that the deadline had been extended, some of these warrant holders asked if Toups would be willing to allow them to exercise their warrants, even though they were "late." Without disclosing that the deadline had actually been extended, information that would have been material to the warrant holders, Toups agreed to process their requests.

50.     Also after the extension was announced, some warrant holders who had already exercised their warrants, in part based on the assurances that the October 29 deadline would not be extended, requested to withdraw their warrant exercises. Their requests were not granted.

51.     From October to early December 2012, approximately 977,000 warrants were exercised, generating proceeds of approximately $2.2 million. Almost two-thirds, or 600,000, of these warrants were exercised *after* the extended November 29, 2012 expiration date.

52.     This unofficial extension worked to the unfair advantage of Longwei and the late-exercising holders. Longwei was able to raise an additional $1.2 million, while the late-exercising holders benefited from exercising *after* they witnessed a significant stock price increase: Longwei's stock closed at $2.23 on November 29; $2.46 on Friday, November 30; and $2.78 on Monday, December 3. Rather than being forced to purchase at the higher market price on November 30 and December 3, the late-exercising holders were able to purchase at the lower warrant price of $2.255, which gave them immediate, risk-free profits, an advantage not afforded to the warrant holders who had exercised prior to the initial two deadlines.

**Toups Makes a Sham Purchase of Longwei Stock to Drive Up Longwei's Stock Price**

53.     During this same time, Longwei and Toups received advice from an analyst close to the company suggesting that it was important for Longwei's insiders to show confidence in the company by publicly purchasing shares of the company's stock, which would in turn help

push the stock price above the warrant exercise price. This would encourage warrant holders to exercise their contracts because doing so would be immediately profitable.

54.     On November 15, 2012, Li instructed Toups to buy 3,000 Longwei shares when the market opened the following day. And the next day Li wired $6,600 to Toups's personal bank account to fund the purchase.

55.     Toups promptly purchased 3,200 shares with the funds he received from Longwei and filed a related Form 4 publicly disclosing the stock purchase. Neither Toups nor Longwei disclosed that Toups used company funds, and not his own money, to purchase the stock.

56.     Toups's sham purchase had the intended effect. Investors took notice of the CFO buying shares "[using] his own money," and Longwei's stock price increased by 10% in the days immediately following Toups's trade using company funds.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a) of the Securities Act
### (Against Toups and Longwei)

57.     The Commission incorporates the allegations in paragraphs 1- 56 as if fully set forth herein.

58.     By engaging in the conduct described above, Toups and Longwei, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or with severe recklessness, employed devices, schemes, or artifices to defraud.

59.     By engaging in the conduct described above, Toups and Longwei, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

and at least negligently, obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading and engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit on the purchaser.

60.     Accordingly, Toups and Longwei violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Fraud in Connection with the Purchase or Sale of Securities**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**(Against Toups and Longwei)**

61.     The Commission incorporates the allegations in paragraphs 1-56 as if fully set forth herein.

62.     By engaging in the conduct described above, Toups and Longwei, directly or indirectly, by use of means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit upon any person.

63.     Toups and Longwei engaged in this conduct knowingly or with severe recklessness.

64.     Accordingly, Toups and Longwei violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Books and Records Violations
### Violation of Section 13(a) of the Exchange Act and
### Rules 13a-1, 13a-13, and 12b-20 thereunder
### (Against Longwei)

65.     The Commission incorporates the allegations in paragraphs 1- 56 as if fully set forth herein.

66.     Longwei, in reports filed with the Commission from September 2012 through November 2012, misrepresented, failed to disclose, and/or made misleading omissions regarding the capacity of the storage tanks at its facilities and the company's inventory. Further, Longwei has failed to file annual or quarterly reports since November 2012.

67.     By engaging in this conduct, Defendant Longwei, whose securities are registered pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)], failed to file annual and quarterly reports (on Forms 10-K and 10-Q) with the Commission that were true and correct, and failed to include material information in its required statements and reports as was necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     Accordingly, Longwei violated, and unless restrained and enjoined will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-13, and 12b-20 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

a. finding that each of the Defendants committed the violations alleged against them in this Complaint;

b. permanently enjoining Toups from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

c. permanently enjoining Longwei from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-13, and 12b-20 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13];

d. ordering Toups to disgorge any ill-gotten gains or unjust enrichment from the conduct alleged in this Complaint, plus prejudgment interest thereon;

e. ordering each of the Defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

f. permanently prohibiting Toups from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

g. granting such other and further relief as this Court deems just and appropriate.

Dated:  June 27, 2016

Respectfully  submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

Timothy  L. Evans
Trial Counsel
Texas Bar No. 24065211

Dwight Thomas Keltner
Texas Bar No. 24007474

United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
Telephone:  (817) 978-5036
Facsimile:  (817) 978-4927
evanstim@sec.gov

*Attorneys for Plaintiff United States
Securities and Exchange Commission*